UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
GARY GRIFFIN,                           :
                                        :
                        Plaintiff,      :    21cv8247 (DLC)
                                        :
            -v-                         :    OPINION AND
                                        :    ORDER
THE CITY OF NEW YORK, et al.,           :
                                        :
                        Defendants.     :
                                        :
--------------------------------------- X

APPEARANCES:

For plaintiff:

Kenneth J. Gorman
Getz & Braverman
172 East 161st Street
Bronx, NY 10451

For defendants Jacqueline Mahal, Darnell A. Cain, Charles
Ofori-Ampomah, Jermine Ricketts, and Styve Pamphile:

Adi Halevi
Jonathan D. Rubin
Kaufman Borgeest & Ryan LLP
875 Third Avenue
New York, NY 10022

For defendants the City and New York and the New York City
Police Department:

KellyAnne Holohan
New York City Law Department
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

    Plaintiff Gary Griffin claims that his constitutional

rights were violated when he was forced to undergo medical

treatment at Jacobi Medical Center following a car accident.  He has sued doctors and nurses who treated him, the City of New York, the New York City Police Department, and unnamed individual defendants.  The defendants have moved for summary judgment.  For the following reasons, those motions are granted.

## Background

The following facts are taken from the evidence submitted in connection with the motions for summary judgment.  Unless otherwise noted, the facts are undisputed or taken in the light most favorable to the plaintiff.

At 2:58 a.m. on December 15, 2018, Griffin was in the backseat of a taxi that was rear-ended while he was commuting in the Bronx.  Evidence in the record, including Griffin's hospital records, reflects that Griffin injured his head, back, and knee during the accident.

The only contrary evidence is Griffin's testimony in his November 22, 2024 deposition.  In his deposition, Griffin testified that he did not hit his head during the accident, and that only his back and knee were injured.  He also denied losing consciousness or feeling lightheaded at the time of the accident.  But that deposition testimony is contradicted by Griffin's own prior testimony in a hearing that was held on June 17, 2019 pursuant to New York General Municipal Law § 50-h.

There, Griffin repeatedly testified that the accident caused him to hit the front of his head on the seat in front of him, resulting in a "head injury."  He also testified that he "blacked out when the car was hit," and then felt "dizzy" and had a "severe headache."

Griffin was unable to walk after the accident.  EMS arrived on the scene, placed him on a stretcher, and transported him by ambulance to the Jacobi Medical Center emergency department.  He arrived there at 4:03 a.m.  The hospital records reflect that he was triaged between 4:35 a.m. and 4:47 a.m., at which time he rated his pain as an 8 out of 10 and stated that he had not lost consciousness during the accident.  It was also noted during triage that there had been moderate damage to the vehicle and that the airbag did not deploy.  He was classified as "Class 3," meaning that he was ill but in stable condition and did not need immediate treatment.

Griffin was left to wait in a hospital bed in the emergency department before receiving further treatment.  During that time, he recorded two videos on his phone, which is not allowed. The first of these is a 1 minute and 27 second video in which Griffin states that it has been an hour since he arrived at the hospital and repeatedly complains that the hospital is denying him care.  In the second video, which is 2 minutes and 43

seconds, Griffin notes that the time is 5:10 a.m. and again complains that he is not receiving treatment. At some point while waiting, Griffin fell asleep. Griffin appears to have been seen by a nurse by 6:05 a.m.

Resident emergency medicine physician Dr. Darnell A. Cain evaluated Griffin. The hospital records reflect that during Dr. Cain's evaluation, Griffin told him he had lost consciousness during the accident -- the opposite of what Griffin had said during triage. Dr. Cain observed a small central forehead hematoma and midline spinal tenderness to palpation. Despite previously complaining about a lack of medical treatment, Griffin now refused to participate in Dr. Cain's evaluation and refused to change into a hospital gown. Griffin has testified that Dr. Cain indicated that he could be discharged without further treatment.

Dr. Cain also noted that Griffin was "combative" and "threatening," and had been "cursing." Other hospital staff made similar observations. At 6:05 a.m., Charles Ofori-Ampomah, a nurse, noted that Griffin was "agitated," had "punched a wall in the ED," and had stated that he was going to sue the hospital. Ofori-Ampomah also noted that hospital police had been informed that Griffin was recording videos in the emergency room, and he had instructed Griffin to stop doing that.

4

Likewise, in a note started at 7:42 a.m. and completed at 9:51 a.m., Jermine Ricketts, a nurse, stated that Griffin was "agitated and combative" and "uncooperative."

The supervising attending emergency medicine physician, Dr. Jacqueline Mahal, had the ultimate responsibility of deciding whether to approve Griffin's discharge from the emergency department.  Upon being advised of Griffin's status, Dr. Mahal assessed that there was a possibility that Griffin was seriously injured.  In particular, she assessed that he could be experiencing an intracranial hemorrhage from head trauma, which is a life-threatening brain injury that can cause changes in mental status.  The information that Dr. Mahal considered in making that assessment includes the fact that Griffin had been in a car accident, his statement that he had lost consciousness at the time of the accident (after having previously denied that he had lost consciousness), his forehead hematoma, his spinal tenderness to palpation, and changes in behavior that could be indicative of a change in mental status -- including his agitation, the fact that his description of the accident had changed, and his recent refusal to engage in care.  Dr. Mahal determined that the proper course was to conduct a CT scan of Griffin's head, a CT scan of his spine, and an x-ray of his

chest.  These radiological tests were necessary to rule out a serious or even fatal injury.

Griffin was moved to a room where Dr. Mahal attempted to further evaluate him.  But, as with Dr. Cain, Griffin refused to be evaluated and stated that he wished to refuse any further treatment.  Generally, when a patient wishes to refuse treatment in an emergency medicine setting, the custom and practice among emergency medicine physicians is to conduct a face-to-face conversation with the patient to evaluate whether he fully understands the risks of refusing care, including any risk of death.  A patient is deemed to have the capacity to refuse care only if he shows that he understands those risks.

Dr. Mahal attempted to conduct that customary conversation with Griffin about the risks of refusing treatment, including the possibility that he had a fatal brain injury.  Griffin did not engage in that conversation.  He did not respond to Dr. Mahal's questions and, in her opinion, did not demonstrate an understanding of the risks of refusing care.  Dr. Mahal thus concluded that Griffin did not have the mental capacity to appreciate the risks of refusing care, and that he needed to be restrained in order to receive the necessary care.  He was sedated with an injection of Versed and Haldol.

Griffin used his phone to record part of this interaction in a video, which is 3 minutes and 34 seconds. The video shows Dr. Cain and Dr. Mahal telling Griffin that he must answer questions from Dr. Mahal in order to refuse medical treatment, and Dr. Mahal attempting to engage with him. Griffin is agitated. He repeatedly interjects that he is refusing treatment but does not engage in a conversation.

Griffin testified in his deposition that he was hit in the head in the hospital while he was being restrained, and that this injury has caused him hearing loss and ringing in his ear. He gave a different account of this injury in his § 50-h hearing. There, he testified that there was an effort to take his phone away in order to make him stop recording the video, he was fighting for his phone, someone then "punched . . . the phone, not me," and as a result "the phone was smashed up against my head."

While sedated, Griffin was placed on a cardiac monitor to continue his evaluation. At 9:11 a.m., emergency medicine physician Dr. Seth Nulman ordered direct restraints to restrict movement of his wrists. Dr. Nulman noted that after a "face-to-face examination of the patient including physical status, mental status, and medications" it was determined that "less restrictive measures would be unsuccessful in maintaining

safety."  At 9:00 a.m., nurse Ricketts likewise noted that
restraints had been placed on Griffin "for the emergency
management of unanticipated outbursts of aggression, destructive
or violent behavior that poses an imminent danger to the patient
or others."

Beginning at 9:22 a.m., Griffin underwent CT scans of his
head and spine and an x-ray of his chest.  At 10:59 a.m.,
resident emergency medicine physician Dr. Styve Pamphile
examined Griffin.  He noted that "[u]pon arrival patient was
verbally and attempted to be physically abusive to hospital
staff and was sedated after verbal de-escalation was
unsuccessful."  At 12:14 p.m., Dr. Pamphile noted that the
radiological tests showed no acute findings and cleared Griffin
for discharge.  A family member took him home from the hospital.

Before filing this action, Griffin served a Notice of Claim
upon the City of New York Law Department and New York City
Health and Hospitals Corporation.  He alleged in that claim, as
in this action, that he was wrongfully restrained and forced to
undergo treatment without his consent.  As noted, a § 50-h
hearing was held on June 17, 2019 in connection with that claim.

Griffin filed this action on October 6, 2021.  An amended
complaint was filed on December 3, 2021.  An Opinion of
September 21, 2023 by the Honorable Paul A. Crotty dismissed a

conspiracy claim, state law claims, and <u>Monell</u> and respondeat superior claims as to certain defendants.  <u>Griffin v. Jacobi Med. Ctr.</u>, No. 21cv8247, 2023 WL 6198801 (S.D.N.Y. Sept. 21, 2023).  The complaint was amended again on October 31, 2023 and January 4, 2024.  This action was reassigned to this Court on April 15, 2024.

The remaining claims are a claim of unreasonable seizure and excessive force in violation of the Fourth and Fourteenth Amendments and a claim of conspiracy to violate Griffin's civil rights, both pursuant 42 U.S.C. § 1983.  The defendants remaining in the action include several doctors and nurses who treated Griffin: Dr. Mahal, Dr. Cain, nurse Ofori-Ampomah, nurse Ricketts, and Dr. Pamphile (collectively, the "Jacobi Defendants"), as well as unnamed other physicians.  The other remaining defendants are the City of New York and the New York City Police Department (the "City Defendants"), as well as unnamed New York City police officers.

Following completion of discovery, the Jacobi Defendants and the City Defendants filed separate motions for summary judgment on February 7, 2025.  The Jacobi Defendants' motion is accompanied by an expert affirmation of Dr. Robert Meyer, an Associate Professor of Emergency Medicine at the Albert Einstein College of Medicine, who opines that Griffin's treatment was

reasonable and in accordance with the applicable standards of
care.  On March 28, Griffin filed a single opposition to summary
judgment that responds to both the Jacobi Defendants and the
City Defendants.  The Jacobi Defendants and the City Defendants
filed separate replies on April 18.

## Discussion

Summary judgment is appropriate when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  Material facts are those facts that "might
affect the outcome of the suit under the governing law."  Choi
v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation
omitted).  "[S]ummary judgment must be rejected if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party."  Indemn. Ins. Co. of N. Am. v. Unitrans Int'l
Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted).  "The
court's role with respect to such a motion is not to resolve
disputed questions of fact but solely to determine whether, as
to any material fact, there is a genuine issue to be tried."
Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir.
2024) (citation omitted).

Generally, "a district court may not discredit a witness's
deposition testimony or declaration on a motion for summary

10

judgment, because the assessment of a witness's credibility is a function reserved for the jury." Frost v. New York City Police Dep't, 980 F.3d 231, 246 (2d Cir. 2020) (citation omitted). There is, however, an exception "in the rare circumstance where the plaintiff relies almost exclusively on her own testimony, much of which is contradictory and incomplete, to establish a triable issue of fact." Gardner-Alfred v. Fed. Rsrv. Bank of New York, 143 F.4th 51, 68 (2d Cir. 2025) (citation omitted). To apply this exception, a court must find that "the record contradictions with the plaintiff's testimony are inescapable and unequivocal," id. (citation omitted), and the "testimony is so problematic that no reasonable juror could credit it." Frost, 980 F.3d at 246. This exception recognizes that, in some circumstances, "a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised genuine issues of material fact to be decided by a jury." Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 106 (2d Cir. 2011).

"A § 1983 plaintiff must establish that a person acting under the color of state law deprived him of a right guaranteed by the Constitution or the laws of the United States." Vincent v. Annucci, 63 F.4th 145, 151 (2d Cir. 2023). A plaintiff seeking damages under § 1983 "must prove more than just a

deprivation of his rights; he must also establish that the
deprivation caused him some actual injury." Id. (citation
omitted).  "[A] doctor will not be liable under § 1983 for the
treatment decisions she makes unless such decisions are such a
substantial departure from accepted judgment, practice, or
standards as to demonstrate that she actually did not base the
decision on such a judgment."  Kulak v. City of New York, 88
F.3d 63, 75 (2d Cir. 1996) (citation omitted).

Griffin brings a § 1983 claim alleging that he was
subjected to three violations of his constitutional rights:
unreasonable seizure in violation of the Fourth Amendment,
excessive force in violation of the Fourth Amendment, and a
violation of his right to refuse medical treatment under the
substantive component of the Fourteenth Amendment's Due Process
Clause.  He also brings a § 1983 claim alleging that the
defendants entered into a conspiracy to violate his civil
rights.  As explained below, the defendants are entitled to
summary judgment on each of these claims.

I.   Unreasonable Seizure

Griffin asserts that the defendants unlawfully seized him
when they forced him to undergo treatment that he had refused.
The Fourth Amendment prohibits unreasonable seizures, and an
involuntary hospitalization is a seizure within the meaning of

the Fourth Amendment.  See Anthony v. City of New York, 339 F.3d
129, 137 (2d Cir. 2003).  In general, seizures are unreasonable
if they are not supported by probable cause.  Tenenbaum v.
Williams, 193 F.3d 581, 602-03 (2d Cir. 1999).  In the context
of an involuntary hospitalization, probable cause exists if
"there are reasonable grounds for believing that the person
seized is dangerous to herself or to others."  Anthony, 339 F.3d
at 137 (citation omitted).

Griffin has not produced evidence from which a reasonable
jury could conclude that his hospitalization was unreasonable or
not supported by probable cause.  To begin with, the defendants
have produced unrebutted evidence that Dr. Mahal and her team
had reasonable grounds for believing that Griffin himself was in
danger.  He had been in a car accident, had recently reported
that he lost consciousness during the accident, had a forehead
hematoma, and had exhibited changes in behavior.  Dr. Meyer
attests that, in light of this evidence, Griffin showed signs of
altered mental status and potential life-threatening injury,
possibly an intracranial brain hemorrhage, and that Dr. Mahal's
decision to order radiological tests was not only reasonable but
necessary.  Moreover, Dr. Meyer explains that "[h]ad Mr. Griffin
been discharged prior to testing and walked out of the ED, given

his altered mental status, the potential for injuries are calamitous and endless."

Dr. Meyer also attests that Dr. Mahal appropriately assessed that Griffin did not have the capacity to refuse care because he was unable to have a conversation with Dr. Mahal about the risks of doing so, including the risk of death. As Dr. Meyer explains, "[a]lthough it would have been far easier for Dr. Mahal to allow Mr. Griffin to leave without attempting to conduct testing, it was her dedication, compassion, and thoroughness that precluded her from allowing Mr. Griffin to leave prior to completing the evaluation."

In addition, the record makes clear that Griffin was a danger to others. He had punched a wall, and was described by hospital staff as "agitated," "combative," and "threatening." Hospital staff documented that Griffin had cursed at them and attempted to be physically abusive. As Dr. Meyer explains, the danger that Griffin posed to hospital staff and other patients was an additional reason that it was appropriate to restrain him.

In arguing that his claim of unreasonable seizure should withstand summary judgment, Griffin primarily points to his own deposition testimony. There, he stated that he did not punch a wall, did not curse at hospital staff, and generally did not do

anything to provoke the force used to restrain him.  This argument fails for two independent reasons.

First, even if a reasonable jury could credit this deposition testimony, it still could not conclude that Griffin was subjected to unreasonable seizure.  At best, Griffin's deposition testimony would create a dispute of fact as to whether he was a danger to others at the hospital.  But Griffin has not shown that his deposition testimony, even if credited, would create a dispute of fact as to whether Dr. Mahal had reasonable grounds for believing that Griffin himself was in danger.  That alone is sufficient to justify his involuntary hospitalization.

Second, this case presents the rare circumstance in which the plaintiff's deposition testimony should be discredited on a motion for summary judgment.  Griffin testified in his deposition that he never hit his head during the accident, which, if true, would appear to undermine the hospital's reasons for treating him.  But, as discussed, that testimony is starkly inconsistent with what Griffin himself said in his earlier § 50-h hearing.  Griffin's deposition testimony is also inconsistent with reliable evidence, including documentation in his medical record that he had a forehead hematoma and other detailed notes in his medical record by several doctors and nurses.  Overall,

Griffin's "inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether the party has raised <u>genuine</u> issues of material fact to be decided by a jury." <u>Rojas</u>, 660 F.3d at 106.

Griffin also points to the video he took around the time that he was being sedated, but that video is of no assistance to him. To be sure, the video does show that Griffin insisted that he did not want to be treated. But the defendants do not contest that, and it does not undercut their point that Griffin's conduct did not reflect that he had the capacity to refuse care. Indeed, the video confirms that. It shows that Dr. Mahal and Dr. Cain attempted to engage Griffin in a conversation about his treatment, and that Griffin, in an agitated state, was unwilling or unable to have that conversation. And while Griffin points to the video as evidence that he was not physically violent or threatening, that argument cannot undercut the evidence that he himself was in danger of death. Moreover, this short video only shows a small snippet of Griffin's behavior over multiple hours, and the same is true of his two other videos.

II. Excessive Force

Griffin asserts that the defendants used excessive force when they restrained him. Claims of excessive force are also

rooted in the Fourth Amendment's prohibition against
unreasonable seizures.  Linton v. Zorn, 135 F.4th 19, 31 (2d
Cir. 2025).  The Fourth Amendment is violated if "a defendant
applied excessive force in a manner that was objectively
unreasonable under the circumstances."  Id.  This inquiry
requires the court to "evaluate the record from the perspective
of a reasonable [person] on the scene, rather than with the
20/20 vision of hindsight," and involves "balancing of the
nature and quality of the intrusion on the individual's Fourth
Amendment interests against the importance of the governmental
interests alleged to justify the intrusion."  Id. (citation
omitted).  Courts consider, among other factors,

> [1] the need for the application of force, [2] the
> relationship between the need and the amount of force
> that was used, [3] the extent of the injury inflicted,
> and [4] whether force was applied in a good faith
> effort to maintain or restore discipline or
> maliciously and sadistically for the very purpose of
> causing harm.

Id. (citation omitted).

Griffin has not produced evidence from which a reasonable
jury could find that unreasonable force was used against him.
As noted, Dr. Mahal made an informed assessment that Griffin was
in danger of losing his life, that radiological tests were
needed to rule out a serious and perhaps fatal injury, and that
he did not have the capacity to refuse care.  Dr. Meyer attests

that this was consistent with the standard of care, and that
discharging Griffin would have been a deviation from the
standard of care.  Because Griffin was not cooperating, he was
sedated through an injection and later had wrist restraints
applied.  Dr. Meyer opines that each of these steps was
reasonable and necessary to maintain both Griffin's own safety
and the safety of others.

Again relying solely on his self-serving deposition
testimony, Griffin claims that he sustained injuries as a result
of the force used against him, and that those injuries include
ringing in his ear and fear of doctors.  But even if a
reasonable jury could accept as true that he sustained those
injuries, that could not overcome the evidence that the force
used against him was objectively reasonable and necessary under
the circumstances.  As noted, claims of excessive force are not
evaluated "with the 20/20 vision of hindsight."  Id.

Moreover, Griffin has not submitted sufficient evidence
that he sustained any injury in the hospital.  He has provided
no expert testimony to support such a claim.  And, here too, his
self-contradictory testimony fails to create a genuine issue of
material fact, as it provides a shifting and incomplete account
of how this alleged injury occurred.  While he gave the
impression in his deposition that someone directly hit him in

the head, he previously testified in his § 50-h hearing that he was fighting someone for his phone and that this struggle caused his phone to hit him in the head.  It is also relevant here that Griffin testified in his § 50-h hearing that he hit his head during the car accident, lost consciousness, and then felt dizzy.  All of that raises questions as to whether the damage to his ear, if there was any, might have been caused by the car accident.

Griffin's testimony that he sustained an injury in the hospital is also inconsistent with the other evidence in the record.  Although he indicated in his § 50-h hearing that the injury happened while he was recording the video of him being sedated, and that his phone (which was recording the video) somehow hit him in the head, there is no indication of that in the video.  And although hundreds of pages of Griffin's medical records have been produced in this case, Griffin identifies no evidence in those records that he complained of hearing loss or ringing in his ear, whether on the day of the accident or in subsequent medical appointments.

III. Fourteenth Amendment Right to Refuse Medical Treatment

Finally, Griffin asserts that the defendants violated his right to refuse medical care.  The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any

19

person of life, liberty, or property, without due process of
law." U.S. Const. Amend. XIV § 1. Under the Due Process
Clause, "a competent person has a constitutionally protected
liberty interest in refusing unwanted medical treatment."
Cruzan by Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278
(1990). Whether a plaintiff's "constitutional rights have been
violated must be determined by balancing his liberty interests
against the relevant state interests." Id. at 279 (citation
omitted). "To establish a violation of substantive due process
rights, a plaintiff must demonstrate that the state action was
so egregious, so outrageous, that it may fairly be said to shock
the contemporary conscience." Southerland v. City of New York,
680 F.3d 127, 151-52 (2d Cir. 2012) (citation omitted). A
physician's decision to involuntarily commit a person because he
poses a danger to himself or others shocks the conscience "when
the decision is based on substantive and procedural criteria
that are substantially below the standards generally accepted in
the medical community." Bolmer v. Oliveira, 594 F.3d 134, 143
(2d Cir. 2010) (citation omitted); see also Rodriguez v. City of
New York, 72 F.3d 1051, 1063 (2d Cir. 1995).

The Second Circuit has noted that "a jury composed of
non-experts typically cannot discern generally accepted medical
standards for itself." Olivier v. Robert L. Yeager Mental

Health Ctr., 398 F.3d 183, 190 (2d Cir. 2005).  Thus, a
plaintiff bringing a § 1983 claim premised on a violation of a
medical standard of care "ordinarily must introduce expert
testimony to establish the relevant medical standards that were
allegedly violated."  Id.

Because Griffin has not provided any expert evidence, he
would be unable to prove at trial that his care deviated from
generally accepted medical standards.  Meanwhile, the Jacobi
Defendants have provided the affirmation of Dr. Meyer, which is
compelling expert evidence that Griffin's treatment was
reasonable and conformed to accepted standards of medical care.
It certainly cannot be said that any of the defendants' actions
shock the conscience.

Griffin brings several arguments that Dr. Meyer's
affirmation does not provide grounds to dismiss his Fourteenth
Amendment claim.  These arguments all overlook the fact that it
is Griffin's burden in the first instance to produce expert
evidence, and he has not done so.  Each of these arguments also
fails for other reasons.

First, Griffin complains that Dr. Meyer did not include a
copy of his C.V.  But Dr. Meyer's affirmation demonstrates his
experience, including that he has twenty-five years of
experience as an attending emergency medicine physician.  He is

well qualified to opine on the standards of care relevant to
this case.

Griffin also argues that Dr. Meyer takes a "biased view of
the evidence" because certain aspects of his affirmation are
inconsistent with statements that Griffin made in his
deposition.  As explained, Griffin himself has contradicted his
deposition testimony.  For example, Griffin objects to Dr. Meyer
describing him as losing consciousness during the accident, but
that is what Griffin himself testified in his § 50-h hearing.
It was entirely reasonable for Dr. Meyer to discount some
statements in Griffin's testimony in favor of more reliable
evidence, including Griffin's medical records.

Finally, Griffin argues that Dr. Meyer is not qualified to
opine on the issues in this case because he lacks a psychiatric
background.  But Griffin provides no evidence that a
psychiatrist, as opposed to an attending emergency medicine
physician, is needed to determine the standard of care in an
emergency room setting.

IV.  Conspiracy

"To prove a § 1983 conspiracy, a plaintiff must show: (1)
an agreement between two or more state actors or between a state
actor and a private entity; (2) to act in concert to inflict an
unconstitutional injury; and (3) an overt act done in

22

furtherance of that goal causing damages." <u>Pangburn v.</u>
<u>Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999).  A § 1983 conspiracy
claim "will stand only insofar as the plaintiff can prove the
<u>sine qua non</u> of a § 1983 action: the violation of a federal
right." <u>Singer v. Fulton Cnty. Sheriff</u>, 63 F.3d 110, 119 (2d
Cir. 1995).  Because Griffin has not provided evidence from
which a reasonable jury could conclude that he was deprived of a
constitutional right, his conspiracy claim fails as well.

V.   Unnamed Defendants

Griffin makes no argument that his claims against unnamed
physicians and New York City police officers should withstand
summary judgment.  He has therefore waived these claims.
Moreover, there is no evidence that any other physicians or any
police officers were involved and, even if they were, any such
claims would be subject to summary judgment for the same reasons
as the claims against the Jacobi Defendants and the City
Defendants.

## Conclusion

The Jacobi Defendants' February 7 motion for summary
judgment is granted.  The City Defendants' February 7 motion for
summary judgment is granted.  Griffin's claims against unnamed
defendants are also dismissed.  The Clerk of Court shall enter

judgment for the defendants and close the case.

Dated:      New York, New York
            August 22, 2025

                                    _____
                                        DENISE COTE
                            United States District Judge